**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

BANK OF AMERICA, N.A.
As Successor by Merger to Merrill Lynch
Bank USA

     Plaintiff,

         v.                                 Civil Action No. 10-CV-00857 AW

JILL P. MITCHELL LIVING
TRUST U/A DTD 06.07.1999 *et al.*,

     Defendants.

---

**MEMORANDUM OPINION**

Plaintiff Bank of America, N.A. ("the Bank") brings this action against the following Defendants: Jill P. Mitchell Living Trust U/A DTD 06/07/1999 ("the Trust"); Jill P. Mitchell ("Ms. Mitchell"); and Bryan J. Mitchell ("Mr. Mitchell"). The Bank asserts claims for breach of contract and breach of guarantee in connection with a loan agreement. The Trust and Ms. Mitchell ("Counter-Plaintiffs") assert counterclaims for breach of contract, fraud, and violation of the Maryland Consumer Protection Act. The following motions are pending before the Court: (1) The Bank's Motion to Strike Defendants' Jury Trial Demand ("Motion to Strike"); (2) The Bank's Motion for Summary Judgment with Regard to Counterclaim ("Motion for Summary Judgment on Counterclaim"); and (3) Counter-Plaintiffs' Motion for Summary Judgment ("Motion for Summary Judgment"). The Court has reviewed the entire record, as well as the pleadings and exhibits, and finds that no hearing is necessary. Local Rule 105.6 (D. Md. 2011). For the reasons that follow, the Court **GRANTS** the Bank's Motion to Strike; **GRANTS-IN-**

**PART** and **DENIES-IN-PART** the Bank's Motion for Summary Judgment on Counterclaim; and (3) **GRANTS-IN-PART** and **DENIES-IN-PART** Counter-Plaintiffs' Motion for Summary Judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Bank of America, N.A. ("the Bank") is a National Banking Association whose corporate headquarters and principle place are located in North Carolina. The Bank is the successor by merger to Merrill Lynch Bank, USA ("Merrill Lynch"). Defendant Jill P. Mitchell Living Trust U/A DTD 06/07/1999 ("the Trust") is a grantor revocable *inter vivos* trust created on June 7, 1999 through a Trust Agreement. Defendant Jill Mitchell is currently Trustee of the Trust.

The Trust and Merrill Lynch entered into a Merrill Lynch Loan Management Account Agreement ("Agreement") on June 13, 2006. The Agreement "establishes the terms and conditions that govern the . . . Loan Management Account." Doc. 45-4 § 1. Ms. Mitchell and her husband, Bryan Mitchell, executed the Agreement on behalf of the Trust. The Mitchells also guaranteed the loan in their individual capacities in the event of default. *Id.* at 9–10. The Agreement explicitly names Mr. Mitchell as a co-Trustee with Ms. Mitchell. *Id.* at 9.[1]

Mr. Mitchell is a sophisticated businessman with over two decades' experience in finance and investing. Doc. 43-6. Mr. Mitchell's professional highlights include founding and serving as CEO for a publicly traded commercial finance company whose value at one point exceeded $1.5 billion. *Id.*; Doc. 43-7 at 45–46. The Mitchells sought the particular loan as a "tax advantaged" means of facilitating the purchase of a high-end home in Chevy Chase, Maryland. Doc. 48-1 at 2.

Ms. Mitchell exclusively relied on Mr. Mitchell to deal with the Bank in connection with the loan. Doc. 43-5 at 19–22, 30–32. Even though she voluntarily signed the Agreement, Ms.

---

[1] The Mitchells resided in Montgomery County, Maryland, when they entered into the Agreement.

Mitchell concedes that she failed to read the loan and associated documentation. *Id.* at 30–32. Ms. Mitchell further concedes that she did not understand the nature of the transaction and failed to communicate with the Bank regarding the loan. *Id.* at 21–22, 42–43.

Pursuant to the Agreement, Merrill Lynch agreed to make advances to the Trust, at its discretion, up to the "Maximum Amount." The Agreement defines Maximum Amount as "the highest amount of credit that may be available under the LMA on any given date based on the value of the collateral in the Securities Account." Doc. 45-4 § 3. The Agreement established $3,000,000 as the "Maximum Amount." *Id.* at 8.

The Agreement required the Trust to assign to Merrill Lynch a continuing, first priority lien and security interest in one or more securities accounts established at Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS") as security for the performance of the Trust's obligations under the Agreement. To this end, the Parties designated a "Securities Account" as collateral for advances made under the Agreement, and the Parties later designated two Merrill Lynch accounts for the same purpose.

The Agreement further provided that Merrill Lynch offered three types of advances: "Variable Rate Advances, Fixed Rate Advances, and Term Advances." Doc. 45-4 § 4. Under the direction of Mr. Mitchell, the Trust opted to take a ten-year Fixed Rate Advance (i.e. loan). As stated in the Agreement, Fixed Rate Advances bear finance charges at a fixed rate of interest equal to the Fixed Rate Advance Index, plus the "Spread."

Section 5 of the Agreement contains the term around which the Parties' dispute centers. Under this Section, the Trust agreed to pay to Merrill Lynch "all Advances . . . plus all finance charges, other fees and charges and all other amounts payable under this Agreement." *Id.* § 5. Section 5 continues to state:

3

> If a Fixed Rate Advance . . . is repaid prior to the conclusion of its Fixed Rate Period . . . , whether voluntarily, as a prepayment, or involuntarily as the result of Bank's exercise of any remedy under this Agreement, Borrower will pay Bank a **Breakage Fee** as stated in the Fee Schedule to [the Agreement] . . . at the time of such repayment.

*Id.* (emphasis added).

The Agreement purports to include a Fee Schedule. *Id.* (emphasis added) ("Borrower agrees to pay [the Bank] all other fees and charges stated in the **attached** Fee Schedule . . . ."). The Parties dispute whether the Agreement actually included the Fee Schedule. The Bank asserts that, on June 13, 2006, it sent Mr. Mitchell an email that contained the Fee Schedule as an attachment. Doc. 48-6. To support this assertion, the Bank offers an affidavit from a paralegal swearing that said email included the Fee Schedule as an attachment. Doc. 43-9. For his part, Mr. Mitchell testifies that he had no record of receiving the Fee Schedule when he signed the Agreement. Doc. 43-7 at 53–54. Furthermore, Mr. Mitchell observes that the email's attachment line fails to list the Fee Schedule as an attachment even though the line lists documents that the email allegedly attaches. This omission, according to Mitchell, belies the notion that the Bank sent Mr. Mitchell the Fee Schedule. Along those lines, Mr. Mitchell maintains that he specifically asked a Bank representative, Mr. Greene, about the possibility of a prepayment penalty (i.e. Breakage Fee)[2] in the discussions that took place before Defendants entered into the Agreement. Mr. Mitchell insists that Mr. Greene "assured him that there were no prepayment penalties." Doc. 45-1 at 4. Mr. Greene, however, denies this allegation. The Parties agree that this fact is in dispute.

The Fee Schedule defines Breakage Fee as follows:

> The Breakage Fee is the **cost or expense incurred by the Bank** as a result of the payment of any Fixed Rate Advance . . . , in whole or in part, on a date other than the last day of the interest period for such Fixed Rate Advance . . . , whether such

---

[2] The Parties used the term "prepayment penalty" synonymously with Breakage Fee. Doc. 45-1 at 32 n.17.

> payment is made by the Borrower voluntarily or is effected by the Bank liquidating all or a portion of the Securities Account or otherwise. An administrative fee of $100 for processing this early payment will also apply.

Doc. 45-4 at 12 (emphasis added).

On June 27, 2006, the Trust received a single Fixed Rate Advance (i.e. loan) in the amount of $1,864,335.25 for a period of ten years. On March 24, 2008, the Trust and Merrill Lynch executed an agreement increasing the Maximum Amount to $6,000,000.00. Doc. 45-6. The Amendment states that "[a]ll other terms and conditions of the . . . Agreement remain unchanged." *Id.* The Trust signed this Amendment approximately three to four months after Mr. Mitchell claims to have first learned about the possibility of a Breakage Fee. *Compare* Doc. 48-5, *with* Doc. 45-6.

In the 2008/2009 period, the value of the collateral in the designated Securities Accounts dropped under the principal amount due on the loan and the accruing monthly interest. It is undisputed that the Trust failed to make any interest payments after July 2009. By way of a letter dated January 11, 2010, the Bank terminated the Agreement and demanded immediate payment of $2,225,222.95. According to the Bank, the following charges comprised the $2,225,222.95 amount:

- $864,335.25—Fixed Contract Principal

- $7,074.20—Fixed Contract Accrued Interest

- **$295,520.93—Breakage Fee for Prepayment**

- $100.00—Administrative Fee for Prepayment

- $78,307.15—Variable Principal

- $9.59—Accrued Variable Interest

Doc. 17 at 6 (emphasis added). The Bank's Answers to Interrogatories set forth the method by which the Bank calculated the Breakage Fee:

> The Breakage Fee is calculated by taking the difference between the cost of funds rate at the time of the loan, 5.66%, and the "reinvest rate", which is the cost of funds rate if a loan was made on the date of prepayment, for the period remaining under the LMA Agreement if there had been no prepayment. The "reinvest rate" on January 20, 2010, the date the loan was prepaid, was 2.9845%. The difference between the two rates is 2.6755. The total amount of prepayment is multiplied by that amount, which is divided by 360, and then multiplied by the number of days in the month, which results in the monthly Breakage Fee due. The monthly amounts are then discounted to present value. The present value of the monthly amounts due as a result of the prepayment was $295,520.93 as of January 20, 2010 . . . .

Doc. 48-11 at 5–6.

The Agreement authorized the Bank to liquidate the designated Securities Accounts and associated collateral upon default. On January 20, 2010, the Bank applied the proceeds of the designated Securities Accounts against the charges delineated above. According to the Bank, Defendants still owed a total of $350,222.48 after it applied the proceeds from the Securities Accounts.

On April 7, 2010, the Bank filed a Complaint against the Trust, Ms. Mitchell, and Mr. Mitchell ("Defendants"). Doc. 1. In Count I, the Bank asserts a claim against Counter-Plaintiffs for breach of the Agreement. Count II asserts a claim against the Mitchells for breach of guarantee of the Agreement.

On June 26, 2010, Mr. Mitchell answered and counterclaimed. Doc. 13. On July 13, 2010, the Bank filed a Motion to Dismiss Mr. Mitchell's Counterclaim. Doc. 15.

Counter-Plaintiffs filed a Redacted Answer to the Complaint on July 14, 2010. Doc. 17. Two days thereafter, the Bank filed a Redacted Complaint. Doc. 18.

On December 3, 2010, Counter-Plaintiffs filed a Counterclaim against the Bank. Doc. 27. In their Counterclaim, Counter-Plaintiffs asserted the following claims: (1) violation of the Maryland Consumer Protection Act ("MCPA"); (2) fraud; and (3) breach of contract.[3] On March 14, 2011, the Court granted the Bank's Motion to Dismiss Mr. Mitchell's Counterclaim on the ground that Mr. Mitchell failed to state cognizable claims for relief. Docs. 35-36.

The Bank filed its Motion to Strike on April 18, 2011. Doc. 40. Therein, the Bank argues that the Court should strike Defendants' demand for a jury trial based on a jury waiver provision in the Agreement. Roughly one month later, the Bank filed its Motion for Summary Judgment on Counterclaim. Doc. 43. The Bank argues in this Motion that Counter-Plaintiffs' claims for fraud and violation of the MCPA entail an element of reliance and that Counter-Plaintiffs cannot prove such reliance. The Bank also argues that Counter-Plaintiffs' breach of contract claim is truly a defense to the Bank's breach of contract claim and is therefore unactionable.

On June 6, 2011, Counter-Plaintiffs filed a Motion for Summary Judgment. Doc. 45. Counter-Plaintiffs make numerous arguments in their Motion for Summary Judgment. It is more expeditious to address each of these arguments in the ensuing legal analysis. For now, it is enough to note that Counter-Plaintiffs contend that the law entitles them to summary judgment on each Count of their Counterclaim. In the alternative, Counter-Plaintiffs argue that genuine issues of material facts exist regarding their claims.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only "if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.

---

[3] Counter-Plaintiffs based their Counterclaim partly on allegations that the Bank misrepresented and/or deceived them regarding the interest rate that the Bank charged for the loan. Counter-Plaintiffs no longer base their Counterclaim on this allegation. Doc. 45-1 at 15 n.11.

R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).  The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  Material disputes are those that "might affect the outcome of the suit under the governing law." *Id.*

Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his or her favor, a party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *See Beal v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).  Further, if a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). Finally, hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment. *See Greensboro Prof'l Firefighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

## III.    LAW AND ARGUMENT

### A.    Choice of Law

The Agreement contains a choice-of-law clause providing that Utah law applies to disputes arising under the Agreement. *See* Doc. 45-4 at 7. Preliminary, the Court considers whether it is proper to apply Utah law to the present case.

"A federal court sitting in diversity must apply the choice-of-law rules from the forum state." *Wells v. Liddy*, 186 F.3d 505, 521 (4th Cir. 1999) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941)). Under Maryland law, it is "'generally accepted that the parties to a contract may agree as to the law which will govern their transaction, even as to issues going to the validity of the contract.'" *Nat'l Glass, Inc. v. J.C. Penney Props., Inc.*, 650 A.2d 246, 248 (Md. 1994) (quoting *Kronovet v. Lipchin*, 415 A.2d 1096, 1104 (Md. 1980)). Therefore, courts typically need not inquire into the validity of choice-of-law provisions where "the parties agree that Maryland law governs their claims." *Vanderhoof-Forschner v. McSweegan*, Nos. 99-1615, 99-1616, 2000 WL 627644, at *2 n.3 (4th Cir. May 16, 2000) (citing *Am Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir.1997)); *compare Novell, Inc. v. Microsoft Corp.*, 429 Fed. App'x. 254, 258–61 (4th Cir. 2011) (applying Utah law to contractual dispute without conducting choice-of-law analysis), *with In re Microsoft Corp. Antitrust Litig.*, 699 F. Supp.2d 730, 737 (D. Md. 2010) (applying Utah law to contract in light of parties' agreement that choice-of-law provision governed their dispute), *rev'd on other grounds*, 429 Fed. App'x. 254.

For the foregoing reasons, the Court applies Utah law to the Parties' contractual dispute.

**B.      Breach of Contract**

Counter-Plaintiffs argue that the Breakage Fee does not amount to a "cost or expense incurred by the Bank." In other words, the method by which the Bank calculates the Breakage Fee deviates from the ordinary and plain meaning of said phrase. The Bank responds that the Breakage Fee represents "a cost or expense incurred by the Bank." Therefore, the central issue is whether a reasonable trier of fact could conclude that the Bank's calculation of the Breakage Fee constitutes "a cost or expense incurred by the Bank."

Under Utah law, the "[w]ell-accepted rules of contract interpretation require that [a court] examine the language of a contract to determine meaning and intent." *Glen v. Reese*, 2009 UT 80, ¶ 10, 225 P.3d 185 (citation omitted).  "Utilizing ordinary rules of contract construction, if a contract's terms are clear and unambiguous, the court must construe the writing according to its plain and ordinary meaning." *Elm, Inc. v. M.T. Enters., Inc.*, 968 P.2d 861, 863 (Utah Ct. App. 1998) (citation omitted); *see Glen*, 2009 UT 80 at ¶ 10, 225 P.3d 185 (citation omitted). Giving words their "plain and ordinary meaning" means that the words should be "used in common, daily, nontechnical speech, [and] should, in the absence of evidence of a contrary intent, be given the meaning which they have for laymen in such daily usage." *Mesa Dev. Co., Inc. v. Sandy City Corp.*, 948 P.2d 366, 369 (Utah Ct. App. 1997) (quoting *Gov't Emps. Ins. Co. v. Dennis*, 645 P.2d 672, 675 (Utah 1982)).

It follows from these principles that courts must decide as a matter of law whether a contract is ambiguous. *See WebBank v. Am. Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 22, 54 P.3d 1139 (citing *Winegar v. Froerer Corp.,* 813 P.2d 104, 108 (Utah 1991)). A contract is ambiguous if "it is unclear, it omits terms, or the terms used to express the intention of the parties may be understood to have two or more plausible meanings." *Saleh v. Farmers Ins. Exch.*, 2006 UT 20,

¶ 15, 133 P.3d 428. A court may consider extrinsic evidence to determine the intent of the parties where a contract is ambiguous. *Merrick Young Inc. v. Wal-Mart Real Estate Bus.*, 2011 UT App 164, ¶ 17, 257 P.3d 1031 (citing *City of Grantsville v. Redev. Agency of Tooele City*, 2010 UT 38, ¶ 31, 233 P.3d 461). When such extrinsic evidence fails to clarify the parties' intent, the interpretation of the contract is the province of the finder of fact. *See WebBank*, 2002 UT 88 at ¶ 22, 54 P.3d 1139 (citations omitted).

Here, the Court cannot determine meaning of the disputed provision from the four corners of the contract as a matter of law. The Agreement defines Breakage Fee as the "cost or expense incurred by the Bank." The Bank argues that it incurred a cost of $295,520.93 because of the prepayment of the Fixed Term Advance (i.e. loan). The Bank calculates this cost with reference to a "cost of funds rate." "The cost of funds rate is the interest rate that the Bank calculated it would have to charge for a ten year fixed term loan in order to break even." Doc. 48 at 12. Therefore, in the Bank's estimation, the Breakage Fee represents the difference of the cost of funds rate and the reduced cost of funds rate prevailing on the date of prepayment. In other words, interest rates have declined since the Bank issued the loan and the Bank can relend the money at only a lower interest rate than originally provided.

Counter-Plaintiffs respond that the Breakage Fee constitutes a "future loss," not a "cost or expense incurred." Doc. 50 at 3. Counter-Plaintiffs insist that the Bank's method of calculating the Breakage Fee belies the notion that it constitutes a cost. According to Counter-Plaintiffs, calculating the Breakage Fee requires the bank to look "ahead as to what money would be coming in the future and trying to give that a value in today's dollars." *Id.* Counter-Plaintiffs

view this purportedly "forward-looking" method of calculation as inconsistent with the ordinary meaning of the phrase "cost . . . incurred."[4] Doc. 45-1 at 8.

Both of these theories are plausible interpretations of the disputed provision. The contract does not define the terms comprising the phrase "cost . . . incurred by." The first step, then, is to analyze their ordinary meaning.

A broad reading of the language "cost . . . incurred" supports the Bank's position. Two popular dictionaries define cost expansively. Pertinently, Merriam-Webster's Online Dictionary ("Merriam-Webster's") defines cost as a "**loss** or penalty incurred especially in gaining something." Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/cost (last visited Oct. 26, 2011) (emphasis added). Likewise, Dictionary.com defines cost as a "sacrifice, **loss**, or penalty." Dictionary.com, http://dictionary.reference.com/browse/cost (last visited Oct. 26, 2011) (emphasis added). Both dictionaries define incur as "to become liable or subject to." Merriam-Webster, http://www.merriam-webster.com/dictionary/incur (last visited Oct. 26, 2011); Dictionary.com, http://dictionary.reference.com/browse/incur (last visited Oct. 26, 2011). *Black's Law Dictionary* proposes a similar definition for incur: "To suffer or bring on oneself (a liability or expense)." *Black's Law Dictionary* 836 (9th ed. 2009).

These sweeping senses of cost support the supposition that the Breakage Fee constitutes a cost incurred. If a cost constitutes a loss, it is arguably immaterial that the Bank may incur the cost over the remaining life of the loan. As Counter-Plaintiffs concede, the concept of loss encompasses futurity. If incur connotes becoming liable or subject to a loss, it is similarly

---

[4] Except as otherwise noted, the Court deems it expedient to shorten the phrase "cost or expense incurred by the Bank" to "cost . . . incurred by." The Court takes this step for two basic reasons. First, the Parties center their respective legal theories around the argument that the Breakage Fee either does or does not constitute a "cost." Second, as the Parties seem to acknowledge, the words "cost" and "expense" are synonymous.

immaterial that the loss occurs over the loan's remaining life. Theoretically, at least, when the Bank reinvests at a lower interest rate, it becomes certain that the Bank will earn less on the loan than it anticipated. This experience seems to encompass the idea of becoming liable or subject to a financial detriment.

A narrow reading of the phrase "cost . . .  incurred by" lends some support to Counter-Plaintiffs' theory. *Black's Law Dictionary* defines cost more narrowly than the abovementioned lexicons: "[t]he amount paid or charged for something; price or expenditure." *Black's Law Dictionary* 397 (9th ed. 2009). In this definition, the verb "charge" connotes that an acting party imposes on a receiving party an amount for something. Such a definition of cost seems inapposite where, as here, a party argues it has incurred (i.e. received) a cost. The Trust does not actively impose the cost on the Bank. Rather, the cost flows from the confluence of the Trust's failure to make timely payments on the loan and the intervening interest rate drop.

Furthermore, the preceding definition of cost uses the verb pay with an object (i.e. pay *an amount*). Where the verb pay comes with an object, it typically denotes an act in which one party gives something to another party. *See* Dictionary.com, http://dictionary.reference.com/browse/pay (last visited Oct. 26, 2011). Again, this sense seems inapposite in that the Trust does not actively impose the cost on the Bank.  Admittedly, one can use pay with an object to denote relatively passive acts. A party can, for instance, "pay a price" for freedom. Nevertheless, this colloquial use of the verb pay approaches the outer bounds of the concept of cost. Hence, it may be ill-suited to resolve ambiguities in a financial context.

In sum, the ordinary meaning of the phrase "cost . . . incurred by" is unclear. The phrase's constituent terms are broad and seem to encompass the concept of future economic loss. Yet *Black's Law Dictionary*'s relatively narrow definition of cost provides some authority for the

conclusion that the phrase is ambiguous. Therefore, as a starting point, one can conclude that the language "cost . . . incurred by" is facially ambiguous.

This ambiguity does not end the textual inquiry. Utah law requires courts to use the ordinary rules of contractual construction to determine a contract's meaning and, by extension, the parties' intent. A canon of contractual interpretation is that courts should construe contracts with a view to giving effect to all the contract's terms. *See Buehner Block Co. v. UWC Assocs.*, 752 P.2d 892, 895 (Utah 1988). A corollary of this canon is that courts should interpret contracts in a way to avoid rendering any provision meaningless. *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 28, 210 P.3d 263.

In light of this canon, Counter-Plaintiffs point to the Bank's 2008 LMA Agreement. The Bank created the 2008 LMA Agreement after it acquired Merrill Lynch. The 2008 Agreement, to which Defendants are not signatories, contains a broader definition of Breakage Fee. The pertinent part of the 2008 LMA Agreement reads as follows:

> The Breakage Fee will be an amount . . . sufficient to compensate Bank for any loss, cost or expense incurred (or expected to be incurred) by it . . . , including any loss of anticipated profits  . . . . [The] Bank shall be deemed to have funded each Fixed Rate Advance or Term Advance by a matching deposit or other borrowing in the applicable interbank market.

Doc. 45 at 20 (quoting Doc. 45-17 at 15).

Counter-Plaintiffs argue that the Bank's interpretation of the phrase "cost . . . incurred by" would render parts of this expanded definition of Breakage Fee superfluous. Specifically, Counter-Plaintiffs contend that the Bank reads the language "cost . . . incurred by" to cover "any loss . . . incurred (or expected to be incurred) by it . . . , including any loss of anticipated profits." This reading, according to Counter-Plaintiffs, would render the more detailed language in the 2008 Agreement superfluous. Counter-Plaintiffs also aver that the Bank construes the phrase

"cost . . . incurred by" to include match-funding. This construction, similarly, would reduce the phrase "Bank shall be deemed to have funded each [loan] by a matching deposit or other borrowing in the applicable interbank market" to mere surplusage.

Albeit persuasive, Counter-Plaintiffs' textual argument is not dispositive. The Bank disputes Counter-Plaintiffs' characterization of the Bank's interpretation of the phrase "cost . . . incurred by." Though it is somewhat unclear from the discovery record and the Bank's memoranda, the Bank seems to eschew the suggestion that the Breakage Fee involves a future loss, at least in a broad sense. The Bank instead emphasizes that the Breakage Fee represents the difference of the cost of funds rate prevailing at the loan's inception and the cost of funds rate prevailing at the time of prepayment. Furthermore, the Bank explicitly rejects the contention that it match-funded the loan in question. In the Bank's words, "[t]he Bank is such a large institution that a particular fixed rate loan cannot be matched against a particular fixed rate deposit used to fund the loan." Doc. 48 at 13. "Instead, the Bank manages risk by looking to all of its assets and liabilities." *Id.*

The Bank rejects the proposition that the modified agreement's definition of Breakage Fee is probative of the meaning of the original agreement's definition of Breakage Fee on another ground. The Bank notes that the revisions to the original agreement took place after Bank of America acquired Merrill Lynch. The Bank also observes Bank of America and Merrill Lynch had similar security-based lending businesses. Therefore, according to the Bank, the revisions simply sought to align the companies' two agreements as closely as possible. In related fashion, one could argue that the modified definition of Breakage Fee serves to clarify the original definition, not to contradict it.

The most salient weakness in Counter-Plaintiffs' textual argument is that the modified agreement is not a part of the original agreement. Technically, then, the maxim that courts should try to give effect to all the terms of a contract is inapplicable. One more properly characterizes the modified agreement as extrinsic evidence of trade usage. Although this evidence of trade usage is probative, it is not controlling in light of the Bank's counterarguments and the Court's associated analysis.

The preceding discussion demonstrates two propositions. First, the ordinary meaning of the definition of Breakage Fee is facially ambiguous. Second, the principle that courts should construe contracts to avoid rendering terms superfluous fails to resolve this facial ambiguity. The next step in the analysis is to consider extrinsic evidence bearing on the meaning of the disputed provision.

The record reveals little extrinsic evidence elucidating the meaning of phrase "cost . . . incurred by." This is unsurprising given that the Agreement is a form contract. *Express Recovery Servs., Inc. v. Rice*, 2005 UT App 495, ¶ 3 n.1, 125 P.3d 108 (stating that extrinsic evidence is commonly lacking in the non-negotiated terms of form contracts). In fact, the bulk of the extrinsic evidence consists in the somewhat self-serving testimony of Defendants and various Bank employees. In the main, these statements simply reiterate the Parties' respective interpretations of the phrase "cost  . . . incurred by." The Court need not rehash these competing interpretations as it has already discussed them at length.  Suffice it to say that the available extrinsic evidence fails to clarify the meaning of the disputed provision.

Counter-Plaintiffs take umbrage with this evaluation of the extrinsic evidence. Counter-Plaintiffs argue that the testimony of the Bank's witnesses conflicts with its interpretation of the phrase "cost . . . incurred by." Thus, Counter-Plaintiffs conclude that "the only issue of fact is to

determine which of the two conflicting versions of [a party's] testimony is correct." Doc. 50 at 6. In such cases, in Counter-Plaintiffs' view, "a genuine issue of fact is not created." Although the testimony of the Bank's witnesses does not harmonize perfectly, Counter-Plaintiffs overstate the degree to which their testimony conflicts.

Counter-Plaintiffs assert that the testimony of Brian Spletzer, the Bank's Manager for Investment Lending, disproves the idea that the Breakage Fee represents a cost rather than a future revenue stream. Counter-Plaintiffs highlight Spletzer's testimony that the Breakage Fee compensates the Bank for the lost "expected income stream." Doc. 50 at 7. Nevertheless, income is an indefinite word and the Bank's interpretation of the phrase "cost . . . incurred by" does not categorically reject the conception of the Breakage Fee as a future loss. Such selective citations of the discovery record fail to gainsay the reality that genuine issues of material fact exist as to what the Parties' intended by the phrase "cost . . . incurred by."

Counter-Plaintiffs also argue that the testimony of a Bank witness contradicts the Bank's position that it incurred a cost because it could reinvest at only a lower interest rate. In this connection, Counter-Plaintiffs point to the testimony of Kenneth White, a mixed fact and expert witness for the Bank. In Counter-Plaintiffs' words, White "testified that the Bank **assumes** that the funds are reinvested in a fixed rate income instrument, not a variable rate." Doc. 50 at 7. (emphasis added). This assumption, according to Counter-Plaintiffs, undercuts the stance that the Bank has truly incurred a cost due to prepayment. Indeed, Counter-Plaintiffs read White's testimony for the proposition that "the department that calculates the Breakage Fee does not know when or where the repaid funds are actually reinvested." *Id.* Thus, in Counter-Plaintiffs' estimation, "the Bank could earn greater profits (not losses) if the Bank actually reinvested at variable or higher interest rates." *Id.*

The Bank does not entirely gainsay Counter-Plaintiffs' gloss on White's testimony. The Bank argues that it "is such a large institution that a particular fixed rate loan cannot be matched against a particular fixed rate deposit used to fund the loan." Doc. 48 at 13. "Instead, the Bank manages risks by looking at all of its assets and liabilities." *Id.* In other words, the cost of funds rate "was created in order to hedge the loan through its final maturity." *Id.* at 12.

However, Counter-Plaintiffs do not seriously dispute that, at least in part, the Bank funds its lending undertakings with borrowed money and that the Bank pays interest on that money. Nor do Counter-Plaintiffs seriously dispute that fixed interest rates were lower when the Bank prepaid the loan than when the Bank originated it. Additionally, although the Bank could reap greater profits by reinvesting the loan at a higher interest rate, the evidence does not indicate that it did. In short, genuine issues of material fact exist as to whether—and, if so, to what extent— the Bank incurred a cost when it prepaid Counter-Plaintiffs' loan.

Counter-Plaintiffs make two more major arguments in terms of contractual construction. One, Counter-Plaintiffs contend that White's testimony shows that the Bank—as distinguished from a business unit—did not incur the cost in question. Two, Counter-Plaintiffs argue that the Court must construe the phrase "cost . . . incurred by" against the drafter as a matter of law because it is ambiguous. Neither of these arguments has merit.

Unlike the terms "cost," "expense," and "incurred," the Agreement defines the Bank as "Merrill Lynch Bank USA." Bank of America succeeded Merrill Lynch by merger. Therefore, by extension, the Agreement defines the Bank as "Bank of America." When calculating the Breakage Fee, White's department allocates the cost to a unit of the bank. Thus, Counter-Plaintiffs argue that a "business unit," not the Bank, incurs the cost. At a glance, this distinction appears fatuous. The ordinary conception of the word bank includes the bank's business units.

Presumably, then, Bank of America's business units are part and parcel of the Bank. Indeed, Counter-Plaintiffs do not rely on the rules of statutory construction in reaching this conclusion. Instead, Counter-Plaintiffs base their conclusion on the testimony of White, the Bank's witness. But White expressly contradicts Counter-Plaintiffs' characterization of his testimony. White states: "At the top of the house the bank is suffering a loss as a result the prepayment of the loan." Doc. 48-7 at 80. At minimum, a genuine dispute of material fact exists regarding whether the Bank—as distinguished from a "business unit"—incurred the cost in question.

The Court also declines Counter-Plaintiffs' invitation to construe the phrase "cost . . . incurred by" against the Bank. Although Utah law permits courts to construe ambiguous terms against the drafter where, as here, extrinsic evidence fails to clarify their meaning, this step is a "last resort." *Express Recovery Servs.*, 2005 UT App 495 at ¶ 3 n.1, 125 P.3d 108 (citation omitted); *see also Meadow Valley Contractors, Inc. v. State Dep't. of Transp.*, 2011 UT 35, ¶ 64, No. 20090025, 2011 WL 2685747, at *15 (citing cases). The relegation of this principle to reserve status comports with the general rule that the interpretation of ambiguous contracts is a question of fact for the finder of fact. *See WebBank*, 2002 UT 88 at ¶ 22, 54 P.3d 1139 (citations omitted). In fact, Utah law precludes courts from granting a motion for summary judgment where "'a legal conclusion is reached that an ambiguity exists in the contract and there is a factual issue as to what the parties intended.'" *Id.* (quoting *Faulkner v. Farnsworth*, 665 P.2d 1292, 1293 (Utah 1983)). In this respect, Utah law is in accord with controlling authority from this jurisdiction. *See Wash. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 235 (4th Cir. 2007) (stating that summary judgment is inappropriate where "resort to

extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation").[5]

For the reasons set forth above, the Court denies Counter-Plaintiffs' Motion for Summary Judgment on the Bank's breach of contract claim.

***

The Court proceeds to address the merits of the Bank's Motion for Summary Judgment on Counterclaim in relation to Counter-Plaintiffs' breach of contract claim. As stated above, the Bank argues that Counter-Plaintiffs' breach of contract claim fails because it is actually a defense to the Bank's breach of contract claim. The Court's terse treatment of this issue reflects the fact that the argument is manifestly meritorious.

A breach of a contract occurs when a party fails to complete the performance of obligations that the contract contemplates. *IOSTAR Corp. v. Stuart*, No. 1:07-CV-133, 2009 WL 270037, at *13 (D. Utah Feb. 3, 2009) (citing *Metro Oil Co., Inc. v. Sun Refining and Mktg. Co.*, 936 F.2d 501, 504 (10th Cir.1991)); *see also Black's Law Dictionary* 213 (9th ed. 2009) (defining breach of contract as a "[v]iolation of a contractual obligation by failing to perform one's own promise . . . ."). A breaching party usually has no right to enforce a contract. *Eggett v. Wasatch Energy Corp.*, 2004 UT 28, ¶ 22, 94 P.3d 193 (citations omitted); *see Fernandez v. Purdue*, 518 P.2d 684, 686 (Utah 1974) (Ellett, J., dissenting) (citation omitted).

In this case, Counter-Plaintiffs materially breached the Agreement by failing to satisfy their financial obligations thereunder. Consequently, the Bank terminated the Agreement, assessed Counter-Plaintiffs' charges pursuant to the Agreement, and liquidated the designated Securities Accounts. The liquidated amount was insufficient to cover the assessed charges,

---

[5] This ruling would not preclude the trier of fact from construing the ambiguous phrase against the drafter in the event that the evidence presented at trial failed to clarify the phrase's meaning.

wherefore the Bank sued Counter-Plaintiffs to recover the difference. Counter-Plaintiffs' contend

that the Agreement failed to authorize one of the assessed charges, to wit, the Breakage Fee.

Nevertheless, the Bank did not promise in the Agreement to refrain from assessing a Breakage

Fee if Counter-Plaintiffs materially breached their obligations under it. In fact, the Agreement

explicitly authorizes the Bank to assess a Breakage Fee in the event of prepayment.

Counter-Plaintiffs respond that the Bank breached by calculating the Breakage Fee in a

manner that is inconsistent with its definition. But the Breakage Fee's definition is ambiguous.

Given this ambiguity, it is illogical to say that the Bank *promised* not to calculate the Breakage

Fee in such a way. And even if the Bank somehow promised not to respond to Counter-

Plaintiffs' material breach by attempting to enforce an ambiguous remedy for damages, Counter-

Plaintiffs have no right to enforce the contract owing to their breach. Accordingly, the Court

grants the Bank's Motion for Summary Judgment on Counterclaim with respect to Counter-

Plaintiffs' breach of contract claim.

**C.      Unconscionability**

Counter-Plaintiffs argue that the contract is unconscionable and, hence, unenforceable.

The ensuing analysis shows that the Agreement is not unconscionable.

Unconscionability connotes "'an absence of meaningful choice on the part of one of the

parties together with contract terms which are unreasonably favorable to the other party.'" *Ryan

v. Dan's Food Stores, Inc.*, 972 P.2d 395, 402 (Utah 1998) (quoting *Res. Mgmt. Co. v. Weston

Ranch,* 706 P.2d 1028, 1043 (Utah 1985)). "A party claiming unconscionability bears a heavy

burden." *Ryan*, 972 P.2d at 402 (citing *Res. Mgmt. Co.*, 706 P.2d at 1041). "The law enables

parties to freely contract, establishing terms and allocating risks between them." *Id.* (citing *Res.

Mgmt. Co.*,706 P.2d at 1040–41). The law's preference for freedom of contract is so strong that

"[t]he law even permits parties to enter into unreasonable contracts or contracts leading to a hardship on one party." *Id.* (citing *Bekins Bar V Ranch v. Huth*, 664 P.2d 455, 459 (Utah 1983)).

Utah courts employ a two-prong approach to determine whether a contract is unconscionable. *Ryan*, 972 P.2d at 402 (citing *Sosa v. Paulos*, 924 P.2d 357, 360 (Utah 1996)). First, courts consider whether the contract is substantively unconscionable. *Res. Mgmt. Co*, 706 P.2d at 1041. "'Substantive unconscionability' examines the relative fairness of the obligations assumed." *Id.* Second, courts consider whether the contract is procedurally unconscionable. *Id.* "'Procedural unconscionability' focuses on the manner in which the contract was negotiated and the circumstances of the parties." *Id.* "[If] a contract is unconscionable, in whole or in part, the court may . . . refuse to enforce the unconscionable provisions, or it may construe the contract to avoid an unconscionable result." *Bekins Bar*, 664 P.2d at 459.

1.      *Substantive Unconscionability*

"'Substantive unconscionability' examines the relative fairness of the obligations assumed." *Res. Mgmt. Co.*,706 P.2d at 1041. For a contract to be substantively unconscionable, its terms must be "so one-sided as to oppress or unfairly surprise an innocent party." *Id.* (quoting *Bekins Bar*, 664 P.2d at 462). Likewise, courts may consider a contract unconscionable where there exists "an overall imbalance in the obligations and rights imposed by the bargain." *Id.* (quoting *Bekins Bar*, 664 P.2d at 462). Courts conduct this assessment in conformity with "the mores and business practices of the time and place." *Id.* at 1042 (quoting 1 Arthur Linton Corbin, *Corbin on Contracts* § 128 (1963)). Although a gross disparity in terms can support a finding of unconscionability absent evidence of procedural unconscionability, this outcome is "rare." *Res. Mgmt. Co.*, 706 P.2d at 1043.

Counter-Plaintiffs argue that the following characteristics render the Agreement substantively unconscionable: (1) the method by which the Bank calculates the Breakage Fee; (2) a remedy provision that purportedly enables the Bank to unilaterally collect attorney's fees when suing to collect a Breakage Fee based on prepayment of the fixed loan; (3) a provision that authorizes the Bank to unilaterally modify the terms of the Agreement; and (4) a provision allowing the Bank to demand prepayment of a Fixed Rate Advance unilaterally, even if the borrower is not in default. Doc. 45-1 at 24 & n.14.

These provisions fail to render the Agreement substantively unconscionable. It is not readily apparent that the method by which the Bank calculates the Breakage Free is one-sided. The preceding discussion elucidates that the Bank's interpretation of the phrase "cost . . . incurred by" is plausible. In other words, the amount of the Breakage Fee could represent the actual cost the Bank incurred because of prepayment.

The Court is likewise loath to characterize the calculation as unfairly surprising. As their signatures indicate, Defendants had an opportunity to read the Agreement. Had they done so, they would have seen that the Agreement contained a Breakage Fee provision. At that time, Defendants could have inquired as to its meaning. *Cf. ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.,* 2010 UT 65, ¶ 28, 245 P.3d 184 (a party has the burden to read and understand the terms of a contract before signing it and, having signed the contract, may not assert ignorance or failure to read the contract as a defense). Furthermore, even if Mr. Mitchell failed to read the Agreement, Counter-Plaintiffs concede that Mr. Mitchell learned that prepayment would cause the Trust to incur a Breakage Fee a few months before the Trust signed an Amendment incorporating all the other terms and conditions of the original agreement.

The attorney's fee provision at issue fails to salvage Counter-Plaintiffs' supposition that the Agreement is substantively unconscionable. In essence, Counter-Plaintiffs argue that the provision enables the Bank to unilaterally collect attorney's fees when suing to collect a Breakage Fee based on prepayment of the loan. Doc. 45-1 at 24 & n.14. This argument fails because the provision does not bear the meaning that Counter-Plaintiffs attach to it.

The attorney fee's provision reads as follows: "to the extent permitted by applicable law, [Counter-Plaintiffs] agree to pay all of Bank's collection costs, costs relating to the disposition of the Securities Account or any other collateral under this Agreement, and all actual **related** attorney's fees and court costs." 45-4 § 7 (emphasis added). The term "related" qualifies the meaning of "attorney's fees." In this linguistic context, one must conclude that the "attorney's fees" relate only to "the disposition of the Securities Account or any other collateral" under the Agreement. The Bank's suit, however, does not relate to the "disposition of the Securities Accounts or any other collateral." Rather, the suit relates to the disposition of the "Loan Management Account," or perhaps, the "LMA Agreement." Yet, as the language "Securities Account or any other collateral under the Agreement" plainly illustrates, the LMA Agreement defines the terms "Loan Management Account" and "LMA Agreement" separately from "Securities Account." *Compare id.* § 1, *with id.* § 6. In other words, to the extent one exists, the relationship between the Bank's suit and the disposition of the Securities Accounts is entirely too distant to defend the deduction that the former "relates" to the latter under the Agreement.

A cardinal principle of contractual construction solidifies this conclusion. If the attorney's fee provision applied to attorney's fees other than those that relate to the disposition of Securities Accounts, the Bank would have no need to qualify the term "attorney's fees" with "related." The Bank could have worded the provision in the same way, omitting only the word

"related": "[Counter-Plaintiffs] agree to pay all of Bank's collection costs, costs relating to the disposition of the Securities Account or any other collateral under this Agreement, and all actual [] attorney's fees and court costs." Therefore, Counter-Plaintiffs' construction contravenes the maxim that courts should strive to read contracts in a way to give effect to all their terms.

The ordinary rules of language further strengthen this conclusion. The term "relating to" qualifies one type of cost ("[Counter-Plaintiffs] agree to pay all of Bank's collection costs, **costs relating to** the disposition of the Securities Account . . . ."). The words "relating to" and "related" are linguistic cousins. Given this linguistic consanguinity, it seems odd to read the qualifier "related" so as to preclude it from qualifying another category of costs (**related** attorney's fees and **court costs**) when "relating to" qualifies a category of costs in the immediately preceding clause. Therefore, the attorney's fee provision fails to render the Agreement substantively unconscionable.[6]

The provision authorizing the Bank to unilaterally modify the terms of the LMA Agreement fails to render the Agreement substantively unconscionable. The provision provides that the "Bank may modify, amend, or rescind any provision of this Agreement . . . from time to

---

[6]   The Court realizes that its examination of the attorney's fee provision makes it exceedingly unlikely that the Bank would be able to collect attorney's fees if it prevailed on its breach of contract claim. In Utah, courts usually may not award attorney's fees unless they are "authorized by contract or by statute." *Bilanzich v. Lonetti*, 2007 UT 26, ¶ 11, 160 P.3d 1041(citation omitted). As the preceding discussion demonstrates, the Agreement fails to authorize attorney's fees in this case. Furthermore, the Bank has failed to point to a statute purporting to authorize attorney's fees, and the Court knows of none. Therefore, *sua sponte*, the Court strikes from the Complaint the Bank's request for attorney's fees insofar as the Bank bases its request on the Agreement's attorney's fee provision.

   The Court also recognizes that this ruling impairs Counter-Plaintiffs' prospects for recovering attorney's fees. One of the bases for Counter-Plaintiffs' request for attorney's fees is derivative of the Agreement's attorney's fees provision. Utah law prescribes that "[a] court may award . . . attorney fees to either party that prevails in a civil action based upon any . . . written contract, . . . when the provisions of the . . . written contract, . . . allow at least one party to recover attorney fees." Utah Code Ann. § 78B-5-826. Here, the Agreement's attorney's fee provision does not allow either Party to recover attorney's fees. By its terms, the provision authorizes only the Bank to collect attorney's fees, and this case falls outside of the category of cases in which the attorney's fee provision applies. Therefore, the Court *sua sponte* strikes Counter-Plaintiffs' request for attorney's fees insofar as Counter-Plaintiffs base their request on the Agreement's attorney's fee provision.

time by giving Borrower **30 days notice** in writing prior to the effective date." Doc. 45-4 § 12 (emphasis added). Courts may enforce contracts that provide a party with the unilateral right to modify an agreement so long as the contract requires the party to give advance notice of his or her intention to do so. *See BCD LLC v. BMW Mfg. Co., LLC*, 360 Fed. App'x. 428, 435 n.2 (4th Cir. 2010) (citing *Am. Gen. Life & Accident Ins. Co. v. Wood*, 429 F.3d 83, 91 n.5 (4th Cir. 2005)). In such cases, the party does not "retain[] an *unlimited* right to decide the nature or extent of his performance." *Res. Mgmt. Co.*,706 P.2d at 1038 (emphasis added). Rather, the party is providing something of value "for at least 30 days." Restatement (Second) of Contracts § 77 cmt. b, illus. 5 (1981); *see Stanich v. Hissong Group, Inc.*, No. 2:09-cv-0143, 2010 WL 3732129, at *5–8 (S.D. Ohio Sep. 20, 2010) (citing cases) (expounding the distinction between an unlimited right to modify or cancel an arbitration agreement and a right limited by virtue of a notice provision). The duty of good faith and fair dealing further mitigates the cancellation provision's one-sidedness, insofar as any exists. *See Res. Mgmt. Co.*,706 P.2d at 1037. Moreover, it bears emphasis that the Bank lent Counter-Plaintiffs a considerable sum of money in exchange for their promise to repay the money with interest. In short, the wealth of consideration that infuses the Agreement confounds the contention that the cancellation provision is substantively unconscionable.

Whether the provision unilaterally empowering the Bank to demand prepayment of the loan is substantively unconscionable presents a closer question. In the worst-case scenario, the Bank demands prepayment even if the Trust is not in default, whereupon the Bank imposes a Breakage Free for the prepayment.

Decisions regarding acceleration provisions in real estate contracts are instructive. The Supreme Court of Utah has held that "acceleration provisions in uniform real estate contracts

should be interpreted according to the terms of the contract itself." *Johnston v. Austin*, 748 P.2d 1084, 1089 (Utah 1988). Accordingly, the lender need not give the borrower "notice of default and a reasonable time to cure the default" for the contract to be enforceable. *Id.* "In fact, absent some contractual provision to the contrary, a [lender] may declare that it has chosen to accelerate the debt by simply bringing an action for the collection of the entire debt immediately upon default." *Id.* (citations omitted).

All the same, the Utah Supreme Court has recognized "that acceleration is a harsh remedy." *Williamson v. Wanlass*, 545 P.2d 1145, 1149 (Utah 1976). Thus, notwithstanding the law's preference for enforcing acceleration clauses, courts should refrain from enforcing them where "enforcement would be unconscionable under the circumstances." *Johnston*, 748 P.2d at 1089. An acceleration clause is unconscionable under the circumstances "where the [lender] has no 'reasonable justification' for accelerating." *Id.* (quoting *State Bank of Lehi v. Woolsey*, 565 P.2d 413, 418 (1977)). An example of a reasonable justification for acceleration is a "good faith belief that the prospect of payment is impaired." *Williamson*, 545 P.2d at 1149. Likewise, a lender may not induce a borrower to believe that it will not strictly enforce the contract despite the borrower's default and "then 'crack down' on the [borrower] by rigidly insisting on enforcement, without giving some reasonable notice and opportunity to comply." *Id.* at 1147. In such cases, courts should use their equitable powers to "intervene to alter the contractual provisions." *Johnston*, 748 P.2d at 1089. This latter prescription corresponds to the rule that courts may refuse to enforce unconscionable contractual provisions or limit them to avoid an unconscionable result. *Bekins Bar*, 664 P.2d at 459.

In this case, the Agreement's demand clause is arguably more onerous than the accelerations clauses in *Williamson* and *Johnston*. As these holdings instruct, however, the Bank

would have to have a reasonable justification for any decision to demand immediate payment without notice. Therefore, Counter-Plaintiffs' worst-case scenario is precisely that—a doomsday scenario that is divorced from the relatively mundane facts of this case. Accordingly, as Counter-Plaintiffs seem to suggest, the demand provision is not unconscionable *per se*.

Additionally, even if it were, the Court could sever it from the contract to avoid an unconscionable result. "In Utah, contract provisions are severable if the parties intended severance at the time they entered into the contract and if the primary purpose of the contract could still be accomplished following severance." *Sosa*, 924 P.2d at 363–64 (citing *Mgmt. Servs. Corp. v. Dev. Assocs.*, 617 P.2d 406, 408 (Utah 1980)). Here, one can infer the Parties' intent to sever any unenforceable provision from the Agreement's severability clause. Doc. 45-4 § 12. The Parties can accomplish the primary purpose of the Agreement absent the demand clause because the demand clause does not preclude the Parties from consummating a mutually beneficial financial arrangement.

In light of the preceding considerations, the Agreement is not substantively unconscionable.

### 2. *Procedural Unconscionability*

Procedural unconscionability typically entails the "absence of meaningful choice." *Res. Mgmt. Co.*, 706 P.2d at 1042 (quoting *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C. Cir. 1965)). Courts determine whether a meaningful choice is present by considering "all the circumstances surrounding the transaction." *Id.* Numerous factors inform the question whether a contract is procedurally unconscionable. *See Sosa*, 924 P.2d at 362; *Res. Mgmt. Co.*, 706 P.2d at 1042. Some of these factors include: (1) "whether each party had a reasonable opportunity to understand the terms and conditions of the agreement," *Sosa*, 924 P.2d at 362

(citation omitted); (2) "whether the aggrieved party had a meaningful choice or instead felt compelled to accept the terms of the agreement," *id.* (citation omitted); (3) "whether the agreement was printed on a duplicate or boilerplate form drafted solely by the party in the strongest bargaining position," *id.* (citation omitted); (4) "whether the terms of the agreement were explained to the weaker party," *id.* (citation omitted); and (5) whether the transaction involved exploitation of the underprivileged, unsophisticated, uneducated and illiterate." *Res. Mgmt. Co.*, 706 P.2d at 1042 (citations and quotations omitted).

Nearly all these factors militate in favor of the Bank. Counter-Plaintiffs had a reasonable opportunity to understand the terms of the Agreement because they signed two loan agreements and no facts indicate that the Bank interfered with their ability to read the agreements and inquire as to their terms. Counter-Plaintiffs had a meaningful choice because Mr. Mitchell was an effective consumer in a strong financial position. The facts do not indicate that the Bank barred Counter-Plaintiffs from bargaining with other banks for a better deal. On the contrary, Mr. Mitchell admits that it was a borrower's market, not a lender's. Furthermore, while the Agreement is a form contract, Mr. Mitchell's declarations regarding his business savvy, financial strength, and the favorable market conditions confound the contention that the Bank was in a stronger bargaining position. Therefore, even if the Bank failed to explain the terms to Counter-Plaintiffs, the "transaction involved [no] exploitation of the underprivileged, unsophisticated, uneducated and illiterate." For these reasons, the Agreement is not procedurally unconscionable.

The preceding analysis demonstrates that the Agreement is not unconscionable. Therefore, the Court denies Counter-Plaintiffs' Motion for Summary Judgment in relation to the defense of unconscionability.

**D. Waiver**

Counter-Plaintiffs argue that the Bank waived the Agreement's $100 administrative fee for prepayments. "A waiver is the intentional relinquishment of a known right." *Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n*, 857 P.2d 935, 942 (Utah 1993) (quoting *Phoenix Ins. Co. v. Heath*, 61 P.2d 308, 312 (Utah 1936)). In other words, for waiver to occur, "there must be an existing right . . . and an intention to relinquish it." *Id.* (quoting *Phoenix Ins. Co*, 61 P.2d at 312). "[T]he intent to relinquish a right must be distinct." *Id.* (footnote omitted). "Under this legal standard, a fact finder need only determine whether the totality of the circumstances warrants the inference of relinquishment." *Id.* (citations and quotations omitted).

In this case, the Agreement provides that "[n]o waiver by Bank of any of its rights under this Agreement will be valid unless otherwise agreed to by Bank in writing." Doc. 45-4 § 12. Regarding the writing requirement, the Bank sent the Mitchells a notice of their account status showing an administrative fee of $0.00. Doc. 45-7. Moreover, a Bank witness testified that the Bank waived the administrative fee. Doc. 45-5 at 136, 138–39. These circumstances warrant the inference that the Bank waived its right to collect the administrative fee. Thus, the Court grants Counter-Plaintiffs' Motion for Summary Judgment in relation to the defense of waiver. Hence, to the extent the Bank is entitled to recovery on its breach of contract claim, such recovery shall not include the $100 administrative fee.

**E. Motion to Strike Defendants' Jury Demand**

*1. Applicable Law*

The Bank argues that Utah law applies to the jury waiver provision. Counter-Plaintiffs argue that federal law applies to the jury waiver provision. Counter-Plaintiffs' argument carries the day.

In pertinent part, the Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const. amend. VII. "[T]he right to a jury trial in the federal courts is to be determined as a matter of federal law in diversity as well as other actions." *Simler v. Conner*, 372 U.S. 221, 222 (1963). It follows that, "[i]n a diversity jurisdiction suit, the enforcement of a jury waiver is a question of federal, not state, law." *Med. Air Tech. Corp. v. Marwan Inv., Inc.*, 303 F.3d 11, 18 (1st Cir. 2002) (citing *Simler*, 372 U.S. at 222). Accordingly, the Court considers the enforceability of the jury waiver provision pursuant to federal law.

2.      *Legal Analysis*

Despite its fundamentality, Parties may contractually waive the Seventh Amendment right to trial by jury. *Leasing Serv. Corp. v. Crane*, 804 F.2d 828, 832–33 (4th Cir. 1986). Courts scrutinize contractual waivers of the right to a jury trial for two basic reasons. First, "the law does not presume the waiver of constitutional rights." *Lake James Cmty. Volunteer Fire Dep't, Inc., v. Burke County, N.C.*, 149 F.3d 277, 280 (4th Cir. 1998) (citing *Ohio Bell Tel. Co. v. Public Utils. Comm'n*, 301 U.S. 292, 307 (1937)). Second, there is a "strong federal policy in favor of jury trials." *Mowbray v. Zumot*, 536 F. Supp. 2d 617, 620 (D. Md. 2008). Therefore, a party seeking to enforce a contractual provision waiving the right to a jury trial must establish that the waiver was knowing and voluntary. *Mowbray*, 536 F. Supp.2d at 620 (citing *Leasing Serv. Corp.*, 804 F.2d at 833). Courts determine whether a jury waiver provision is voluntary under all the circumstances. *See Leasing Serv. Corp.*, 804 F.2d at 833. Factors relevant to this determination are (1) the relative bargaining power of the parties; (2) the conspicuousness of the provision; and (3) whether the provision is comprehensible.

Based on these factors, a reasonable juror could only conclude that Counter-Plaintiffs knowingly and voluntarily waived their right to trial by jury. As discussed above, Counter-Plaintiffs stood on par with the Bank in terms of bargaining power. *See supra* Part III.C. The Court declines to rehash these arguments here. It suffices to observe that Mr. Mitchell was a "shrewd businessm[a]n" who found himself in an advantageous economic position. *See Leasing Serv. Corp.*, 804 F.2d at 833 (holding that defendants knowingly and voluntarily waived their right to a jury trial in part because defendants were shrewd businessmen). Ms. Mitchell's efforts to portray herself as an innocent victim are likewise spurious. Ms. Mitchell signed both the Agreement and the Amendment and stood by her husband's side throughout the process. Besides, the law does not permit her to avail herself of her failure to read the agreement. *See Sydnor v. Conseco Fin. Serv. Corp.*, 252 F.3d 302, 306 (4th Cir. 2001) (holding that the defendant's failure to read a contract containing a jury waiver clause renders her ignorance of the clause irrelevant for the purposes of determining whether she knowingly and voluntarily waived her right to trial by jury). Hence, like the defendants in *Leasing Service Corp.*, Defendants "were not manifestly unequal in bargaining positions." 804 F.2d at 833. Hence, this factor cuts against the argument that Counter-Plaintiffs failed to waive their right to trial by jury.

The second factor cuts just as sharply against Counter-Plaintiffs' position. In *Leasing Service Corp.*, the Fourth Circuit upheld the district court's decision that the defendants knowingly and voluntarily waived their right to a jury trial in face of a jury waiver provision that the contract failed to "set off in a paragraph of its own." *Id.* Instead, the provision was "in the ninetieth line of print and [was] in the middle of a thirty-eight line paragraph." *Id.* Furthermore, the provision was "situated on the reverse side" of the contract. *Id.* Here, conversely, the jury waiver is on the front side of the Agreement and is set off in a separate paragraph.

Doc. 45-4 § 12. Noticeably, the waiver is in boldface. Also, although the Agreement is longer than the two-page contact in *Leasing Service Corp.*, "it is far from voluminous" at approximately ten pages. *See Mowbray*, 536 F. Supp.2d at 620–21 (enforcing a jury waiver clause that was "a longer document . . . than the contract in *Leasing Service Corp.*" in part because it was "far from voluminous"). Accordingly, the Agreement's jury waiver provision is sufficiently conspicuous.

The jury provision is also comprehensible. The provision states that "[t]o the extent allowed by law, [Counter-Plaintiffs] . . . waive all right to a jury trial with respect to any action or dispute relating to the LMA or this Agreement." Doc. 45-4 § 12. Counter-Plaintiffs argue that the prefatory clause "to the extent allowed by law" indicates that the provision does not "unequivocally apply in all circumstances." Doc. 42 at 7. For this reason, Counter-Plaintiffs assert that "the Bank must prove that Ms. Mitchell knew at the time she signed the LMA Agreement that she understood the jury waiver provision specifically applied to her."

This argument is a nonstarter. First, Ms. Mitchell admitted that she failed to read the Agreement. Her lack of understanding is thus irrelevant. Second, although the prefatory clause *may* imply that the waiver does not apply "universally" (which, incidentally, is always the case), the reader can readily appreciate the waiver's breadth. The waiver applies to "any action or dispute relating to the [Agreement]" and explicitly applies to Ms. Mitchell. Finally, several district courts have enforced jury waiver provisions containing similar language. *Cf., e.g.*, *Today's Man, Inc. v. Nationsbank, N.A.*, No. CIV. A. 99–479, 2000 WL 822500, at *3 (E.D. Pa. June 22, 2000) (emphasis added) (granting a motion to strike a jury demand based on a jury waiver provision stating that "[the borrower] irrevocably waives, **to the fullest extent permitted by applicable law**, any and all right to trial by jury").

In view of the foregoing analysis, a reasonable juror could only conclude that Defendants knowingly and voluntarily waived their right to trial by jury.

**F.    Maryland Consumer Protection Act**

Counter-Plaintiffs argue that the Bank violated the MCPA in two fundamental ways. First, they maintain that a Bank representative, Mr. Greene, affirmatively misrepresented that the loan did not include a prepayment penalty (i.e. Breakage Fee). This alleged misrepresentation, according to Counter-Plaintiffs, violates the MCPA's prescription against false or misleading statements that tend to deceive consumers. Second, Counter-Plaintiffs contend the Bank failed to inform them about the manner in which the Bank calculates the Breakage Fee, including the risks associated with interest rate fluctuation. This omission, in Counter-Plaintiffs' opinion, contravenes the MCPA's prohibition against omitting material facts in connection with the extension of consumer credit. The Court considers these arguments in turn.

*1.    Misrepresentation Under the MCPA*

The MCPA prohibits commercial entities from engaging in any "unfair or deceptive trade practice" in "[t]he extension of consumer credit." Md. Code Ann., Com. Law § 13-303. The MCPA defines "unfair or deceptive" trade practices to include "false . . . or misleading oral or written statement[s] . . . or other representations . . . [that have] the capacity, tendency, or effect of deceiving or misleading consumers." *Id.* § 13-301. Consumers "may bring an action to recover for injury or loss sustained . . . as the result of" such a misrepresentation. *Id.* § 13-408(a).

Consumers must prove that they relied on the misrepresentation in question to prevail on a damages action under the MCPA. *Philip Morris Inc. v. Angeletti*, 752 A.2d 200, 235 (Md. 2000) (citing cases). A consumer relies on a misrepresentation when the misrepresentation substantially induces the consumer's choice. *Compare Luskin's, Inc. v. Consumer Prot. Div.*, 726

A.2d 702, 727 (Md. 1999) (rejecting the notion that but-for causation is the proper standard for determining reliance under the MCPA), *with Nails v. S & R, Inc.*, 639 A.2d 660, 669–70 (Md. 1994) (rejecting the argument that but-for causation is the proper test for reliance in the context of fraud and, instead, enunciating a standard substantial inducement). Whether a misrepresentation substantially induces a consumer's choice is ordinarily a question of fact for the trier of fact. *Cf. Nails*, 639 A.2d at 669–70 (citing William L. Prosser, *Law of Torts* § 108 (4th ed. 1971)).

The quantum of evidence on which a fact-finder could reasonably conclude that an alleged misrepresentation substantially induces a consumer's choice is relatively low. The Court of Appeals of Maryland has expounded the appropriate test for reliance in common law fraud cases. *Nails*, 639 A.2d at 668–70. In *Nails*, the plaintiffs worked on a commission basis. *Id.* at 661. The plaintiffs testified that their employer promised to pay them a 5% commission based on gross receipts. *Id.* Unbeknown to the plaintiffs, the employer "deducted 15% from the gross receipts before paying the 5% commission." *Id.* Based on this discrepancy, the plaintiffs sued their employer for, *inter alia*, fraud. *Id.* at 662. At trial, the employer moved for a directed verdict on the ground that the plaintiffs failed to prove the element of reliance as a matter of law. *Id.* The employer argued that "the test for reliance is whether the plaintiff would have acted differently 'but for' the misrepresentation." *Id.* n.1. The employer observed that plaintiffs testified that they did not know whether they would have taken the job had they known about the 15% deduction. *Id.* Therefore, the employer argued that no reasonable juror could conclude that the employer's alleged misrepresentation was the but-for cause of the plaintiff's decision to agree to work for the employer. *Id.* According to the employer, this disposition was particularly appropriate considering that plaintiffs must prove fraud claims by clear and convincing evidence.

*See id.* at 664. Nevertheless, the trial court denied the motion and the jury returned a verdict in favor of the plaintiffs, awarding "Nails compensatory damages of $11,394.52 and awarding Bolton compensatory damages of $7,686.73." *See id.* at 662–64.

The case reached the Court of Appeals. Preliminarily, the *Nails* court canvassed the applicable authorities and concluded that but-for causation was not the proper test for reliance in fraud cases. *See id.* at 669–70. Instead, the court enunciated a standard of substantial inducement. *See id.* The Court then held that "the evidence was sufficient for the jury to have concluded that each plaintiff relied on the defendant's misrepresentations." *Id.* at 670. The *Nails* court based its holding on three observations. First, the *Nails* court determined that a jury could have concluded that the employer's promise to pay them a 5% commission based on gross receipts constituted a misrepresentation where the employer deducted 15% from the gross receipts. *See id.* Second, the Court characterized as "substantial" the sum of money that the plaintiffs failed to receive because of the 15% reduction in gross receipts. *Id.* Third, the *Nails* court noted that the plaintiffs testified that the amount that they expected to be paid was of the "utmost importance" in their decision to take the jobs. *Id.* Accordingly, the Court remanded the case with instructions to affirm the jury's verdict. *See id.* at 670.

Counter-Plaintiffs' factual averments are comparable to the facts in *Nails*. Mr. Greene's alleged statement that the Agreement contained no Breakage Fee is more clearly a misrepresentation than the employer's promise to pay the plaintiffs a 5% commission based on gross receipts where the employer deducted 15% from the gross receipts. Furthermore, the Breakage Fee is approximately thirty times higher than the damages that the plaintiffs suffered in *Nails* ($295,520.93 vs. $11,394.52 and $7,686.73). Moreover, just as the plaintiffs in *Nails* testified that their expected pay was of the "utmost importance" in their decision to take the job,

so did Mr. Mitchell testify that the possibility of a prepayment penalty preoccupied him as he negotiated the loan. Doc. 45-1 at 4.

One might respond that Counter-Plaintiffs ignore key differences between this case and *Nails*. Unlike in *Nails*, Counter-Plaintiffs signed the Agreement and the Agreement expressly includes a Breakage Fee provision.  Moreover, dissimilar to *Nails*, Counter-Plaintiffs signed an Amendment incorporating the terms of the Agreement after Mr. Mitchell learned that the Agreement contained a Breakage Fee provision. These differences, arguably, preclude a reasonable trier of fact from finding that Counter-Plaintiffs relied on Mr. Greene's alleged misrepresentation.

Although these distinguishing factors are not without force, a genuine dispute of material fact exists concerning whether Mr. Greene's alleged misrepresentation substantially induced the Trust to enter into the Agreement. The fact that the Trust signed the Agreement does not automatically compel the conclusion that Mr. Greene's alleged misrepresentation failed to substantially factor into this decision. Assuming a relationship of trust existed between Mr. Mitchell and Mr. Greene, Mr. Mitchell might have attached more significance to Mr. Greene's statement than the plain language of the contract. Furthermore, although Counter-Plaintiffs inked an Amendment incorporating the terms of the prior Agreement after Mr. Mitchell learned of the possible Breakage Fee, a reasonable fact-finder could conclude that the taint of the initial misrepresentation had yet to dissipate. Similarly, a fact-finder could conclude that the Mitchells' circumstances changed in the intervening time and that these changes compelled the Mitchells to sign the Amendment despite the specter of a Breakage Fee. Although the Court harbors reservations that a fact-finder would so conclude, the Court understands that the fact-finder usually resolves whether a misrepresentation substantially induces a consumer's choice. The

Court also notes that the *Nails* court held that a reasonable juror could have ruled for the plaintiffs under an evidentiary standard of clear and convincing evidence. In this case, by contrast, the Trust must prove reliance on Mr. Greene's alleged misrepresentation by only a preponderance of the evidence. Along those lines, the Court is mindful of the MCPA's directive for courts to construe it liberally to promote its remedial purposes. *Compare* Md. Code Ann., Com. Law § 13-105, *with id.* § 13-102. Accordingly, summary judgment on the Trust's MCPA misrepresentation claim is improper.

The Court, however, grants the Bank's Motion for Summary Judgment on Counterclaim in relation to Ms. Mitchell's—as distinguished from the Trust's—misrepresentation claim under the MCPA. The Bank argues that Ms. Mitchell could not have relied on Mr. Greene's alleged misrepresentation for the following reasons: (1) Mr. Greene did not make the statement to her; (2) Ms. Mitchell failed to read the Agreement or the Amendment; and (3) Ms. Mitchell played no role in the negotiation process. Ms. Mitchell does not contest these facts. Unlike Mr. Mitchell (i.e. the Trust), Ms. Mitchell cannot excuse her willful failure to read the Agreement on the existence of a misrepresentation. Furthermore, unlike her husband, she has made no averments regarding the existence of a relationship of trust between her and Mr. Greene. Had Ms. Mitchell read the Agreement, she would have seen that the Agreement provided for a Breakage Fee in the event of prepayment. Additionally, Ms. Mitchell had a second opportunity to make this discovery when she signed the Amendment. Nor can Ms. Mitchell argue that Mr. Greene's alleged misrepresentation somehow extends to her. Ms. Mitchell does not allege that Mr. Mitchell relayed the statement to her and, even had he done so, Ms. Mitchell still guaranteed the loan in her individual capacity. Accordingly, the Court grants the Bank's Motion for Summary

Judgment on Counterclaim with respect to Ms. Mitchell's misrepresentation claim under the MCPA.

>    2.    *Material Omission Under the MCPA*

The MCPA prohibits commercial entities from engaging in any "unfair or deceptive trade practice" in "[t]he extension of consumer credit." Md. Code Ann., Com. Law § 13-303. The MCPA defines "unfair or deceptive" trade practices to include the "[f]ailure to state a material fact if the failure deceives or tends to deceive." *Id.* § 13-301(3). Likewise, deceptive or unfair trade practices include an "omission of any material fact with the intent that a consumer rely on the same in connection with: . . . [t]he promotion or sale of any . . . consumer service." *Id.* § 13-301(9). Such omissions are material "if a significant number of unsophisticated consumers would find that information important in determining a course of action." *Green v. H & R Block, Inc.*, 735 A.2d 1039, 1059 (Md. 1999) (citations omitted). A significant number of unsophisticated consumers would find the omitted information important in determining a course of action where such information would likely affect their choice of a good or service. *See Luskin's*, 726 A.2d at 713 (citation omitted). In other words, material omissions occur where a significant number of unsophisticated consumers likely would not have made the disputed choice had the commercial entity not omitted the information in question. *See id.*; *Smith v. Capital One Auto Fin., Inc.*, No. JKB–11–1023, 2011 WL 3328565, at *4 (D. Md. Aug. 2, 2011). Whether a significant number of unsophisticated consumers likely would have acted differently had the commercial entity provided the information in question is ordinarily a question of fact for the fact-finder. *Green*, 735 A.2d at 1059.

A party seeking to recover damages on a material omission theory under the MCPA must prove reliance. The MCPA provides that "any person may bring an action to recover for **injury**

39

**or loss** sustained by him **as the result of** a practice prohibited by this title." Md. Code Ann., Com. Law § 13-403 (emphasis added). The requirement of reliance flows from the MCPA's prescription that the party's "injury or loss" be "the result of" the prohibited practice (i.e. material omission). *See Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 277 (Md. 2007).

The fact that "[t]here is a reliance element in restitution" fortifies this conclusion. *Luskin's*, 726 A.2d at 727. The MCPA authorizes the Maryland Attorney General to seek the remedy of restitution in public enforcement proceedings. Md. Code Ann., Com. Law § 13-402(b)(1)(i). The quantum of proof necessary to prevail in public enforcement proceedings is generally less than in private enforcement proceedings. *See Citaramanis v. Hallowell*, 613 A.2d 964, 969 (Md. 1992). Thus, it would be anomalous if reliance were not an element in private enforcement proceedings based on a theory of material omission.

The Court of Appeals of Maryland has yet to enunciate the precise standard for reliance under the MCPA in the context of material omissions. Nonetheless, one can infer a standard from the applicable authorities. *Luskin's* provides the first clue in that the Court rejected the notion that but-for causation is the proper standard for determining reliance under the MCPA. 726 A.2d at 727. *Nails* is also instructive. The *Nails* court rejected the argument that but-for causation is the proper test for reliance in the context of fraud and, instead, articulated a test of "substantial inducement." 639 A.2d at 669–70; *see supra* Part III.F.1. In view of these authorities, this Court concluded that substantial inducement is the proper test for reliance under the MCPA for misrepresentation claims. *See supra* Part III.F.1.

It is sensible to apply the same standard to material omission claims. Both misrepresentation and omission claims are "unfair or deceptive" trade practices under the MCPA. *See* Md. Code Ann., Com. Law § 13-301. Likewise, misrepresentation and omission

claims are both subsets of common law fraud. *Hoffman v. Stamper*, 867 A.2d 276, 292 n.12 (Md. 2005) ("It has long been clear that '[f]raud may consist in a suppression of the truth as well as in the assertion of a falsehood.'") (quoting *Schnader v. Brooks*, 132 A. 381, 383 (1926)). Accordingly, however "artificial" it may be to state that a consumer relies on an omission, Doc. 45-1 at 36, a consumer relies on a material omission under the MCPA where it is substantially likely that the consumer would not have made the choice in question had the commercial entity disclosed the omitted information. *See supra* Part III.F.1.

In this case, genuine issues of material fact exist regarding whether the Bank's failure to inform Counter-Plaintiffs about the manner in which the Bank calculates the Breakage Fee constitutes a material omission. The Bank does not dispute that a borrower can undergo a substantial financial detriment where, as here, interest rates drop after the loan originates and the borrower voluntarily or involuntarily prepays the loan. Furthermore, although Mr. Mitchell presumably had some familiarity with the risks of interest rate fluctuation, the MCPA's materiality inquiry is from the objective standpoint of an unsophisticated consumer. It seems plausible that many unsophisticated consumers might pass on a loan if they knew that prepayment could trigger fees rising as high as millions of dollars. Doc. 45-5 at 57. Indeed, the Bank concedes that a client needs to "appreciate the risks of interest rate fluctuations" to understand "what a breakage fee is." *Id.* at 53. Granted, "unsophisticated consumers" who take out such large loans may lack aversion for such risks. Moreover, as Counter-Plaintiffs concede, an intervening rise in interest rates would preclude the possibility of paying a Breakage Fee. The finder of fact is best suited to evaluate the existing evidence and make such determinations.

Genuine issues of material fact also exist regarding whether it is substantially likely that the Trust would not have taken out the loan had the Bank disclosed the method by which it

calculated the Breakage Fee. Mr. Mitchell asserts that the prospect of a prepayment penalty preoccupied him when deciding whether to take out the loan. Mr. Mitchell further notes that the Breakage Fee amounts to approximately 15% of the loan and characterizes this share as substantial. Mr. Mitchell also maintains that the Bank's manner of calculating the Breakage Fee failed to conform to his conception of a breakage fee. Based on these factual averments, a reasonable fact-trier could conclude that the Trust might have acted differently had the Bank disclosed information regarding the Breakage Fee calculation method.

Nevertheless, a reasonable trier of fact could conclude that revealing the calculation method most likely would not have changed the Trust's choice. The Trust concedes that Mr. Mitchell learned of the potential for a prepayment penalty before entering into the Amendment, and it is possible that Mr. Mitchell received the Fee Schedule when he first signed the Agreement. In addition, as a sophisticated financier, Mr. Mitchell presumably knew the risks of interest rate fluctuation. One could also infer that Mr. Mitchell lacked aversion for such risks since he sought the loan as a "tax advantaged" means of facilitating the purchase of an exclusive Chevy Chase home. Accordingly, consistent with the general rule, it is best that the fact-finder resolve whether the Trust would have acted differently had the Bank disclosed the contested information.

Nonetheless, the Court grants the Bank's Motion for Summary Judgment on Counterclaim in relation to Ms. Mitchell's material omission claim under the MCPA. To reiterate, Ms. Mitchell relied exclusively on Mr. Mitchell to deal with the Bank concerning the loan. Although she voluntarily signed the Agreement, Ms. Mitchell read neither the Agreement nor the associated documentation. Ms. Mitchell did not understand the nature of the transaction and failed to communicate with the Bank regarding the loan. Given Ms. Mitchell's willful

blindness to the process, no reasonable finder of fact could conclude that it is substantially likely that she would not have guaranteed the loan had the Bank divulged its calculation method.

## G. Fraudulent Misrepresentation[7]

The Bank argues that no reasonable fact-finder could conclude that Counter-Plaintiffs justifiably relied on the Bank's alleged misrepresentation. To recover damages in a fraud action, a plaintiff must prove the following elements: (1) that the defendant made a false representation to the plaintiff; (2) that the falsity was known to the defendant or made with reckless indifference to its truth; (3) that the misrepresentation was made for the purpose of defrauding the plaintiff; (4) that the plaintiff relied on the misrepresentation and **had the right to rely on it**; and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation. *See, e.g.*, *Nails*, 639 A.2d at 668–69 (citations omitted) (emphasis added). For a plaintiff to have a right to rely on an alleged misrepresentation, the plaintiff must reasonably believe in the "full truth" of the misrepresentation. *See James v. Goldberg*, 261 A.2d 753, 758 (Md. 1970) (citations omitted). The plaintiff must prove that he reasonably believes in the full truth of the misrepresentation by clear and convincing evidence. *See Md. Envtl. Trust v. Gaynor*, 803 A.2d 512, 516 (Md. 2002). Clear and convincing evidence denotes "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Jones v. Pitt Cnty. Bd. of Educ.*, 528 F.2d 414, 417 (4th Cir. 1975) (citation and quotation omitted). It is axiomatic that clear and convincing evidence is a higher standard of proof than preponderance of the evidence. *See Addington v. Texas*, 441 U.S. 418, 423–25 (1979).

A person cannot reasonably believe in the full truth of an alleged misrepresentation that directly contradicts the terms of a contract to which the person is a signatory. *James*, 261 A.2d at 758. In *James,* the plaintiff (James) alleged that defendant (Goldberg) orally promised to assign

---

[7] Counter-Plaintiffs' asserted a claim for fraudulent concealment that they have since ceased to pursue.

him Goldberg's lease (Lease) with a third party (Owner). James subsequently signed an agreement ("Assignment Agreement") by which Goldberg purported to assign his Lease to James. *Id.* at 755. The Assignment Agreement incorporated Goldberg's Lease with the Owner. *Id.* The Lease prohibited Goldberg from assigning it without the Owner's written consent. *Id.* Thereafter, James unsuccessfully attempted to obtain the Owner's written consent to the assignment. *Id.* at 756.

Consequently, James sued Goldberg in trial court. *Id.* at 754. James asserted, *inter alia*, a claim for fraud. *Id.* At the close of James's case, the trial court directed a verdict in favor of Goldberg. *Id.* at 756–57. James appealed and the Court of Appeals of Maryland upheld the trial court's decision. *Id.* The Court assumed *arguendo* that Goldberg's promise constituted a misrepresentation. *Id.* at 758. Nevertheless, the Court concluded that James failed to establish as a matter of law that he had "the right to rely upon the representation with full belief of its truth." *Id.* at 758. In reaching this conclusion, the Court noted that the Assignment Agreement's terms directly contradicted the alleged misrepresentation and that James must have known so by reading the incorporated Lease. *Id.* That James graduated from law school buttressed this conclusion. *Id.*; *cf. Holt v. Quaker Oil Ref. Co.*, 67 F.2d 170, 170–71, 173 (4th Cir. 1933) (trial court properly excluded evidence that plaintiff promised defendant indefinite distributorship where this evidence contradicted terms of a series of renewable contracts providing for one-year distributorships; that defendant renewed the contracts and failed to allege fraud until relations turned sour negated inference of fraud, especially under heightened standard of clear and convincing evidence).

The facts in this case compare favorably to the facts in *James*. In this case, like in *James*, the Trust contends that the Bank made an oral promise that directly contradicts the Agreement's

terms. The Trust, like James, would have learned of this contradiction had it read the Agreement. This is particularly true because, similar to the law-school graduate James, Mr. Mitchell is an educated entrepreneur with decades of experience in business and finance. The Trust argues that this fact cuts the other way. That is, based on his financial experience, Mr. Mitchell could not have understood the term Breakage Fee to mean what the Bank interpreted it to mean. This argument misses the point. Mr. Mitchell cannot logically argue that the absence of the Breakage Fee (i.e. the fraudulent promise) induced him to sign the Agreement but that the presence of the Breakage Fee (the contradictory term in the Agreement) does not, at least in part, negate this inducement. In other words, like James, Mr. Mitchell could not rely on the alleged misrepresentation "with full belief in its truth." Furthermore, comparable to the plaintiff in *Holt*, Mr. Mitchell renewed the Agreement—after definitively learning of the possible Breakage Fee— and failed to allege fraud until his personal finances foundered. Therefore, under the heightened standard of clear and convincing evidence, a reasonable fact-finder could only conclude that the Trust unreasonably relied on the alleged misrepresentation. One can conclude *a fortiori* that Ms. Mitchell's reliance—to the extent any existed—was unreasonable because Mr. Greene did not make the alleged misrepresentation to her.

## IV.    CONCLUSION

For the reasons set forth above, the Court **GRANTS** the Bank's Motion to Strike (Doc. 40); **GRANTS-IN-PART** and **DENIES-IN-PART** the Bank's Motion for Summary Judgment on Counterclaim (Doc. 43); and **GRANTS-IN-PART** and **DENIES-IN-PART** Counter-Plaintiffs' Motion for Summary Judgment (Doc. 45). Consequently:

• The Court **STRIKES** Defendants' demand for a jury trial;

- The Court **GRANTS** the Bank's Motion for Summary Judgment on Counterclaim with respect to Counter-Plaintiffs' breach of contract claim;

- The Court **DENIES** Counter-Plaintiffs' Motion for Summary Judgment in relation to the Bank's breach of contract claim;

- The Court **DENIES** Counter-Plaintiffs' Motion for Summary Judgment in relation to the defense of unconscionability;

- The Court, *sua sponte*, **STRIKES** the Bank's request for attorney's fees insofar as the Bank bases its request on the Agreement's attorney's fee provision;

- The Court, *sua sponte*, **STRIKES** Counter-Plaintiffs' request for attorney's fees insofar as Counter-Plaintiffs base their request on the Agreement's attorney's fee provision;

- The Court **GRANTS** Counter-Plaintiffs' Motion for Summary Judgment in relation to the defense of waiver; to the extent the Bank is entitled to recovery on its breach of contract claim, such recovery shall not include the $100 administrative fee;

- The Court **DENIES** the Bank's Motion for Summary Judgment on Counterclaim with respect to the Trust's MCPA misrepresentation claim;

- The Court **GRANTS** the Bank's Motion for Summary Judgment on Counterclaim in relation to Ms. Mitchell's MCPA misrepresentation claim;

- The Court **DENIES** Counter-Plaintiffs' Motion for Summary Judgment with respect to their MCPA misrepresentation claim;

- The Court **DENIES** the Bank's Motion for Summary Judgment on Counterclaim with respect to the Trust's MCPA omission claim;

- The Court **GRANTS** the Bank's Motion for Summary Judgment on Counterclaim with respect to Ms. Mitchell's MCPA omission claim;

- The Court **DENIES** Counter-Plaintiffs' Motion for Summary Judgment with respect to their MCPA omission claim; AND

- The Court **GRANTS** the Bank's Motion for Summary Judgment on Counterclaim with respect to Counter-Plaintiffs' fraud claim;

The Court will schedule a bench trial. An Order consistent with this Memorandum Opinion will follow.

<table>
<tr><td>___November 3, 2011___</td><td></td><td>_____/s/_____</td></tr>
<tr><td>Date</td><td></td><td>Alexander Williams, Jr.<br>United States District Judge</td></tr>
</table>